# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

|  |  |
|---|---|
| EAGLE BEAR, INC., | |
| Plaintiff, | **CV-22-93-GF-BMM** |
| vs. | |
| INDEPENDENCE BANK, | **ORDER** |
| Intervenor Plaintiff, | |
| vs. | |
| THE BLACKFEET INDIAN NATION, and DARRYL LaCOUNTE, DIRECTOR OF THE BUREAU OF INDIAN AFFAIRS, | |
| Defendants. | |

## INTRODUCTION

The Blackfeet Indian Nation, a federally recognized tribe, leased Indian trust land to a non-tribal-member business, Eagle Bear, Inc., ("Eagle Bear"), to operate a campground near the boundary of Glacier National Park. The non-tribal member negotiated the lease with the U.S. Department of Interior Bureau of Indian Affairs ("BIA"), the federal agency tasked with overseeing commercial relations, such as

this business lease, between federally recognized tribes and non-tribal members. Independence Bank, a federally licensed bank, provided a loan to the non-tribal member during the lease to cover the costs of improvements at the campground. These improvements included cabins, a lodge, a swimming pool, and an accompanying water park. A dispute arose whether Eagle Bear had breached the terms of the lease following a series of late payments. This dispute revealed, in turn, a series of omissions and errors by all the Parties.

The Court must analyze the failures of all the Parties to the dispute. The Court must determine which party, or parties, must bear the costs of these systemic failures. The Court first will analyze the development of the trust responsibility to Indian tribes imposed on the federal government. The federal government tasked administration of this trust responsibility to the BIA. The BIA sits as a Defendant in this action. The Court then will review the specific regulations and responsibilities developed by the BIA to regulate non-agricultural business leases of tribal trust lands. The Court will analyze all the Parties' compliance with these regulations and responsibilities based on the record available. Finally, the Court will apply the prevailing law to the extent possible.

## HISTORICAL and REGULATORY BACKGROUND

**A. The Blackfeet Nation as a Federally Recognized Tribe.**

This case concerns the Blackfeet Nation's role in the management and leasing of 53.6 acres of land held in trust by the United States on the Blackfeet Indian Reservation. (Doc. 29-1.) There are 574 federally recognized Indian tribes of the United States. *See* 88 Fed. Reg. 54654 (2023). The Blackfeet Tribe of the Blackfeet Indian Reservation is a federally recognized tribe located within the modern-day boundaries of the State of Montana. *Id*. Federal recognition is "a formal political act [that] permanently establishes a government-to-government relationship between the United States and the recognized tribe as a 'domestic dependent nation,' and imposes on the [federal] government a fiduciary trust relationship to the tribe and its members." H.R. Rep. No. 103-781,103rd Cong., 2d Sess., 2 (1994). Recognition "imposes upon the Secretary of the Interior specific obligations to provide a panoply of benefits and services to the tribe and its members. In other words, unequivocal federal recognition of tribal status is a prerequisite to receiving the services provided by the Department of the Interior's Bureau of Indian Affairs[], and establishes tribal status for all federal purposes." H.R. Rep. No. 103-781, 103rd Cong., 2d Sess., at 3 (1994).

The Blackfeet Nation presently governs and resides on the Blackfeet Indian Reservation in northwest Montana, bordered by Glacier National Park to the west and Canada to the north. The term "reservation" describes the boundaries of the

lands reserved for a tribe or multiple tribes under treaty or other agreement with the United States, executive order, or federal statute or administrative action as permanent tribal homelands. *See* 1 Cohen's Handbook on Federal Indian Law § 3.04 (2019). Though a particular tribe or tribes governs reservation lands, the federal government holds title to the land in trust on their behalf. *See id.* § 15.03.

The principal asset of the Blackfeet Nation is its land situated within the closed confines of the Blackfeet Indian Reservation and held in trust for the tribe by the United States government. The Blackfeet Nation, before European colonization and forced relocation, inhabited "a vast region of country extending from the north fork of the Saskatchewan River in Canada to the headwaters of the [Musselshell] River and from the Rocky Mountains on the west to the 106° of longitude on the east." *Blackfeet et al. Nations v. United States*, 81 Ct. Cl. 101, 104 (1935).

The Blackfeet Nation and several other tribes entered a treaty with the federal government on October 17, 1855, after years of war with the United States and other regional tribes. *Id.*; Treaty with the Blackfeet, Oct. 17, 1855. The United States sought to obtain peace and to pressure tribes to "restrict[] their wanderings within the limits of the areas set apart for and to be occupied by them, as well as to secure the safe passage for white emigrants through the respective areas of the various Indian tribes." *Blackfeet et al. Nations*, 81 Ct. Cl. at 105; Treaty with the Blackfeet, Oct. 17, 1855. The federal government's American Indian policy at that time

prioritized setting definite boundaries for Indian Country to protect Indian rights to their land. The United States restricted whites from entering Indian reservations, removed illegal intruders, and controlled the disposition of Indian lands by denying the right of private parties or local governments to acquire land from the Indians by purchase or other means. The Government abrogated the 1855 Treaty by establishing new boundaries for the reservation on February 11, 1887. Congress ratified these new boundaries on May 1, 1888. Act of May 1, 1888, ch. 213, 25 Stat. 113.

Tribal land ownership today involves a complex patchwork of titles, restrictions, obligations, statutes, and regulations because of Spanish and other European colonization, United States treaty-making, executive orders, and legislation passed under shifting federal American Indian policies. *See* Congressional Research Service, *Tribal Land and Ownership Statuses: Overview and Selection Issues for Congress* (July 21, 2021). The federal government holds in trust much of tribal land within a reservation for the beneficial ownership of a tribe or individual Indians. *See Trust Land and Indian Country Status*, American Indian Law Deskbook § 2:15 (2022). Land held in trust by the United States for the benefit of either the tribe or individual Indians is inalienable and excluded from sale or permanent transfer. *See* 1 Cohen's Handbook of Federal Indian Law § 15.06 (2019).

The United States holds in trust approximately 56.2 million acres for various Indian tribes and individuals. Bureau of Indian Affairs, *Why Tribes Exist Today in*

*the United States*, https://www.bia.gov/frequently-asked-questions (last accessed December 7, 2023). The United States holds over 1.48 million acres in trust for the Blackfeet Nation. Bureau of Indian Affairs, *Blackfeet Agency*, https://www.bia.gov/regional-offices/rocky-mountain/blackfeet-agency (last accessed December 7, 2023). Under the provisions of the Treaty with the Blackfeet Nation and established principles applicable to land reservations created for the benefit of the Indian tribes, tribes and tribal members stand as beneficial owners of the land and of the proceeds of their sale or lease. The tribes' interests remain subject to the plenary power of control by the United States to be exercised for the benefit and protection of the Indians. *United States v. Algoma Lumber Co.*, 305 U.S. 415, 420–21 (1939). The United States acquired no beneficial ownership in the tribal lands or their proceeds. *Id*. Substantial ownership remained with the tribes as it existed before the treaties. *Id*.

Indian tribes "are distinct, independent political communities, retaining their original natural rights in matters of local self-government." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978). A tribe remains free to maintain or establish its own form of government. *See* 1 Cohen's Handbook of Federal Indian Law § 4.01 (2019). Each tribe may determine its membership, enact criminal and civil laws, levy taxes, control tribal property, exercise powers delegated by Congress, and adjudicate certain disputes related to the tribe and its members. The forms of government that

tribes use to govern themselves vary. The Blackfeet Tribal Business Council serves as the governing body of the Blackfeet Nation and remains responsible for exercising powers of government under the Blackfeet Constitution and By-laws. The council oversees the management of tribal lands and resources, business enterprises, and programs and services of the tribe. Blackfeet Nation, *Our Government*, https://blackfeetnation.com/government/ (last accessed December 7, 2023).

The past fifteen years have seen tribes continue to emerge as economic, legal, and political forces. As part of this shift, tribes increasingly have partnered with non-tribal-member and non-Indian businesses to bring new capital to their lands. The Blackfeet Nation is no exception. The Blackfeet Nation operates several economic enterprises on the Blackfeet Indian Reservation. The Blackfeet Nation leases trust lands within the reservation to non-tribal members and entities under numerous leases for agricultural and business enterprises.

Tribal self-governance is not new. Tribes governed themselves for millennia before Spanish and other European "discovery" and conquest. Sharon O'Brien, American Indian Tribal Governments, 238-54 (1989). Commerce between tribes and non-Indian businesses and governments also has a long history. Tribes engaged in trade between different tribes, as well as with colonizing governments and private non-tribal individuals since the arrival of Spanish, French, Portuguese, English, and Dutch colonists beginning in the 1500s. Walter H. Mohr, Federal Indian Relations,

1774-88 (1933) (recounting the relations between Indian tribes and the early colonists). Since the early 1800s, however, the United States government has tasked itself with an affirmative duty to protect Indian tribes and has inserted itself into nearly every aspect of Indian tribes' governance and commerce.

### B. Bureau of Indian Affairs' Trust Responsibility.

This case concerns the failures of the federal agency charged with serving the best interest of the Blackfeet Nation. The Blackfeet Nation sits as the primary Defendant in this matter. The Court deems it appropriate to describe the unique obligations the federal government has assumed in this context. The federal government long has maintained a trust relationship with Indian tribes. The federal government derives its duties as a matter of law from early treaties, statutes, and decisions of the United States Supreme Court. *See Johnson v. M'Intosh*, 21 U.S. 543 (1823); *Cherokee Nation v. Georgia,* 30 U.S. 1 (1831). The federal government "has charged itself with moral obligations of the highest responsibility and trust" toward Indian tribes in making these commitments. *Seminole Nation v. United States*, 316 U.S. 286 (1942).

Statutes enacted by Congress to implement these "moral obligations" should be "construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *County of Yakima v. Confederated Tribes and Bands of Yakima Nation*, 502 U.S. 251, 269 (1992) (internal quotation marks omitted) (stating

that statutes for the benefit of Indians must be liberally interpreted in favor of Indians); *see also Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985) ("[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians.") These obligations extend to any federal government action. *Hoopa Valley Indian Tribe v. Ryan*, 415 F.3d 986, 993 (9th Cir. 2005) (citing *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of Navy,* 898 F.2d 1410, 1420 (9th Cir. 1990)).

Executive authority over Indian affairs generally flows from the President to the United States Secretary of the Department of Interior. Most statutes related to Indian affairs delegate authority for their administration to the Secretary of the Interior. The Secretary of Interior further delegates this authority to the BIA, an agency within the Interior Department. *See* 25 U.S.C. §§ 1, 1a, 2; 43 U.S.C. § 1457. The BIA operates as the agency responsible for maintaining the federal government's trust commitments. *See* 25 U.S.C. §§ 1, 1a, 2; 43 U.S.C. § 1457. The BIA is entrusted with managing and protecting Native American interests. *Wapato Heritage, L.L.C. v. United States*, 637 F.3d 1033, 1037 (9th Cir. 2011).

The BIA's administrative power can be divided into the following three areas: (1) Indian trust asset management; (2) involvement in tribal governmental affairs; and (3) social services, welfare, economic development, education, and housing programs. 1 Cohen's Handbook of Federal Indian Law § 5.03. The BIA has

promulgated numerous, detailed regulations that attempt to ensure that the federal government meets its statutory obligations and duties related to trust assets. These regulations establish rules governing the approval and cancellation of leases of Indian and individual trust lands. *See* 25 C.F.R. § 162 (2023). The BIA "owes a trust responsibility to the owner of trust land, which 'includes ensuring that trust land is not conveyed in violation of relevant statutes and regulations.'" *Tom Flynn v. Acting Rocky Mountain Regional Director, Bureau of Indian Affairs*, 42 IBIA 206, *213 (2006).

The BIA's trust responsibility flows to all federally recognized Indian tribes, including the Blackfeet Nation, when the tribe acts as the lessor of Indian trust land. This unique trust relationship serves, in principle, to assert and protect Indian interests and resources. *See* 25 C.F.R. § 162.108 (2023). The complex and often confounding regulatory structures that insert the BIA into nearly every facet of federally recognized Indian tribes' existence, however, too often hobble tribal self-governance and self-determination. Flawed regulations and inept federal administration trammel tribal interests and disserve the federal trust responsibility.

The United States holds title to Indian trust lands in fee but holds no equitable interest therein. 1 Cohen's Handbook of Federal Indian Law § 15.03 (2019). The United States administers Indian trust lands for the benefit of the tribes and individuals who are the equitable owners of the land. *Id*. Title 25, Part 162 of the

Code of Federal Regulations, as relevant here, limits the Blackfeet Nation's role in the leasing of its own Indian trust lands and requires the BIA to act on the Blackfeet Nation's behalf.

The form of a lease of Indian trust lands and the procedure prescribed for its execution must conform to the long-established trust relationship between the United States and Indian tribes. The BIA possesses the delegated authority, in fulfilling this fiduciary duty, to "take appropriate measures to safeguard the disposal of property of which [Indian tribes] are the substantial owners." *United States v. Algoma Lumber Co*, 305 U.S. 415, 421–22 (1939). Exercise of that power does not necessarily involve the assumption of contractual obligations by the government. *See In re Sanborn*, 148 U.S. 222, 227 (1893); *Turner v. United States*, 248 U.S. 354, 359 (1919). BIA is not a party to, and the agency is not bound to, a commercial lease such as the campground lease at issue in this case. *See Algoma Lumber Co*, 305 U.S. at 421–22; *see also Wapato Heritage, L.L.C.*, 637 F.3d at 1037.

An inspection of the terms of the written lease agreement reveals that the parties to the lease are those who are bound by the terms of the lease. *See Algoma Lumber Co*, 305 U.S. at 421–22. The Blackfeet Nation stands as the lessor, as identified in the campground lease document (Doc. 29-1 at 1), yet it does not administer, monitor, or enforce its lease. *See* 25 C.F.R. § 162.108 (2008). The Blackfeet Nation also possesses no statutory or regulatory obligation to compel the

BIA to act against a lessee who repeatedly violates the terms of a lease agreement. The BIA possesses the sole authority to administer and enforce the lease, including by collecting rent and ensuring that lessees comply with lease terms. *See* 25 C.F.R. § 162.108 (2023); *see also Wapato Heritage, L.L.C.*, 637 F.3d at 1037. The Blackfeet Nation also bears no statutory or regulatory obligation to compel the BIA to take enforcement action against a delinquent lessee. The Blackfeet Nation depends upon the BIA to perform these duties. *See* 25 C.F.R. §§ 162.600–162.623 (2008); *see also* 25 C.F.R. §§ 162.401–162.474 (2023).

### C. Indian Trust Land Business Leasing Regulatory Framework.

The BIA established a regulatory procedure to cancel non-agricultural businesses leases on tribal lands for delinquent payment. A review of that regulatory framework follows. 25 C.F.R. § 2 (2008) and 43 C.F.R. § 4 (2008) set forth the available administrative processes and remedies for the relevant period. *Joint Bd. of Control v. United States*, 862 F.2d 195, 199-201 (9th Cir. 1988); *Faras v. Hodel*, 845 F.2d 202, 204 (9th Cir. 1988); and *White Mountain Apache Tribe v. Hodel*, 840 F.2d 675, 677-78 (9th Cir. 1988). The Court notes that the relevant regulations have since been amended. *See* 25 C.F.R. § 162 (2023).

The BIA possessed the option to "issue bills or invoices to a tenant in advance of the dates on which rent payments [were] due under a lease." 25 C.F.R. § 162.613 (2008). It would remain "the tenant's obligation to make such payments in a timely

manner." *Id.* The regulations sought to protect the interests of the lessor tribe as evidenced by the fact that a tenant's obligation would "not be excused" even if "such bills or invoices [were] not delivered or received." *Id.* The regulations dictated that untimely rent payments remained subject to interest accruing "by the due date [. . .] specified in the lease." *Id*. at § 162.614 (2008). "A tenant's failure to pay rent in the time and manner required by a lease [constituted] a violation of the lease." *Id*.

The regulations further required the BIA to issue notice of a delinquent payment violation within five business days of the date on which the rent payment was due. *Id*. at § 162.618 (2008). If the tenant failed to cure the violation "*within 10 business days*" of the BIA's notice, the BIA would "consult with the Indian landowners, as appropriate." *Id*. at §§ 162.614, 162.619 (2008) (emphasis added). The consultation would determine whether to cancel the lease, invoke any other remedies under the lease or available to the Indian landowners, or grant the tenant additional time to cure the violation. *Id*. The BIA nevertheless retained the authority to cancel the lease and take immediate action to recover the unpaid rent. *Id*. at § 162.614 (2008).

The regulations directed the BIA superintendent, upon his or her decision to cancel a lease, to "send the tenant and its sureties a cancellation letter within five business days of that decision." *Id*. at § 162.619(c) (2008). Cancellation letters must have included several required components: (1) the grounds for cancellation; (2) the

amount of any unpaid rent, interest charges, or late payment penalties due under the lease; (3) the tenant's right to appeal; and (4) an order requiring the tenant to vacate the property within thirty days of the date of receiving the cancellation letter if the tenant failed to file an appeal. *Id*. The tenant retained the right to appeal a cancellation within thirty days of receiving a cancellation letter. *Id*. at § 162.621 (2008). The BIA area director overseeing the superintendent possessed the sole authority to overturn the decision to cancel a lease for delinquent payment. *Id*. at § 2.4. The decision of the area director could have been reviewed by the Interior Board of Indian Appeals ("IBIA"). *Id.* at § 2.4(e). A party typically may bring an action for judicial review only upon exhaustion of these administrative remedies. 5 U.S.C. § 704.

### D. The Blackfeet Nation signs a lease with Eagle Bear in 1997 to allow Eagle Bear to operate a campground on tribal trust land.

In or around 1996, the Blackfeet Tribe solicited bids to find a tenant for Eagle Bear campground. (Doc. 29-3 at 3-4.) William Brooke ("Brooke") negotiated on behalf of Eagle Bear with the BIA and Blackfeet Nation in 1996 and 1997 to enter a lease agreement with the Blackfeet Nation. (Doc. 29-4 at 6). As noted by Brooke, "there was lots of back and forth including from the BIA and from the Tribe. Sometimes in consultation between the BIA and the Tribe and sometimes straight from the BIA." *Id*. Eagle Bear began making capital improvements to the

campground in 1996 because Eagle Bear "thought," mistakenly, "we had a lease between the Tribe and ourselves." (Doc. 29-4 at 7); *see also* (Doc. 32-5); (Doc. 29-4 at 20) ("1996 was a throwaway year").

The Blackfeet Nation manifested approval to lease to Eagle Bear through Blackfeet Tribal Resolution #145-96. (Doc. 35-15.) Blackfeet Tribal Resolution #191-97 approved the lease. (*Id.*) The Blackfeet Nation and Eagle Bear entered a lease agreement on April 11, 1997. (Doc. 29-1.) The lease agreement provided Eagle Bear 53.6 acres within the exterior boundaries of the Blackfeet Nation's tribal land to operate a Kampground of America ("KOA") campground (referred to as the "Campground"). (*Id.*) The lease designates the BIA to act for and on behalf of the Blackfeet Nation, pursuant to the Blackfeet Nation's authority under its own Constitution and By-laws and the provisions of Title 25, Part 162 of the Code of Federal Regulations. *See* (Doc. 29-1 at 1); *see* 25 C.F.R. § 162 (1997). The Blackfeet Nation's business lease agreement with Eagle Bear identifies the Blackfeet Indian Nation as the lessor and Eagle Bear as the lessee. (Doc. 29-1.) The lease refers to and incorporates Title 25 of the Code of Federal Regulations. (*Id.*) Brooke admits that he did not review the Code of Federal Regulations when negotiating the 1997 lease. (Doc. 29-4 at 7.)

The lease provided a term of twenty-five years. (Doc. 29-1 at 3.) Eagle Bear retained an option to extend the term for an additional twenty-five years, contingent

on the Blackfeet Nation's right to purchase the lease extension. (*Id.* at 3-4.) Eagle Bear invested significant resources to develop the Campground into "one of the premier KOAs in the country" during the twenty-five year period from entry of the lease agreement.  (Doc. 23 at 10.) For example, Eagle Bear replaced water, sewer, plumbing, and electrical facilities; rebuilt collapsed buildings and installed new cabins; removed the garbage dumps; and planted hundreds of trees and shrubs. (Doc. 23 at 9.) The Blackfeet Nation likely knew of these investments as nothing in the record indicates that Eagle Bear developed these improvements under cover of darkness or in any manner attempted to conceal these improvements from the public or, specifically, from the Blackfeet Nation. These investments masked Eagle Bear's business management and financial difficulties.

### E. Eagle Bear struggled to keep current on the Lease payments.

Eagle Bear consistently failed to uphold the terms of the lease from its inception. (Doc. 29-4 at 24.) The lease required Eagle Bear to pay the Blackfeet Nation, through the BIA, a minimum annual payment of rent and royalties on November 30 of each year "without prior notice or demand." (Doc. 29-1 at 4-6.) The lease additionally required Eagle Bear to pay interest on delinquent payments from the due date until paid. (*Id.* at 6.) The record before the Court clearly shows Eagle Bear's repeated failure to make timely payments to the BIA. Eagle Bear's representative acknowledged the difficulties:

> We made mistakes. We were late. We were scrambling.
> We were making late payments. We were making
> overpayments. We were making underpayments. Our
> books were a mess. We weren't tracking this stuff as well
> as we needed to be or should be . . . We were making
> payments late more often than I care as I look back on this
> whole thing. It was nightmare-ish time, quite frankly.

(Doc. 29-4 at 24.)

Notice letters from the BIA to Eagle Bear and the BIA's ledger of Eagle Bear's payments from 1997 through 2014 reveal multiple late payments by Eagle Bear. The notice letters and BIA ledger reveal the following delinquencies: 1) the 1998 rent payment was 269 days delinquent, *see* (Doc. 29-17 at 1); 2) the 1999 rent payment was 272 days delinquent, *see* (Doc. 33-1); 3) the 2000 rent payment was 259 days delinquent, *see* (Doc. 33-2); 4) the 2001 rent payment was 229 days delinquent, *see* (Doc. 29-17 at 2); 5) the 2002 rent payment was 907 days delinquent, *see* (*id*. at 2); 6) the 2003 rent payment was 207 days delinquent, *see* (Doc. 33-3); 7) the 2004 rent payment was 260 days delinquent, *see* (Doc. 29-17 at 2); and 8) the 2005 rent payment was 202 days delinquent, *see* (*id*. at 3). Eagle Bear consistently failed to pay the gross registration receipt royalties, and Eagle Bear failed to file required audit reports of gross receipts in 1997, 1998, and 1999. *See* (Doc. 29-1 at 4); (Doc. 33-1.) Eagle Bear also consistently failed to pay any portion of the requisite interest penalty on its late payments. *See, e.g.*, (Doc. 33-4 at 1.)

The Blackfeet Nation received notice of several, but not all, of Eagle Bear's delinquent rent and interest payments, among other lease violations. *See* (Doc. 33-1); (Doc. 33-2); (Doc. 33-3 at 2); (Doc. 33-12); (Doc. 33-20); (Doc. 33-25); *but see* (Doc. 33-4); (Doc. 33-20.) The BIA's mailing practices during this period suggest that inclusion of "cc: Blackfeet Tribe" in the bottom left corner of notice letters indicates that the Blackfeet Nation received those letters. (Doc. 29-30 at 4.) The Court has no other method to determine whether the Blackfeet Nation received the BIA's notices. Nothing in the record shows whether the Blackfeet Nation took any affirmative actions or raised any concerns regarding the lease violations either with the BIA or with Eagle Bear directly.

The Blackfeet Nation Tribal Business Council, the governing body empowered to approve the lease of tribal trust lands, appears to have disregarded Eagle Bear's known deficiencies. The Blackfeet Nation Tribal Business Council instead voted on April 19, 2007, to allow Eagle Bear to encumber the lease to finance further improvements at the campground. (Doc. 33-6 at 3); (Doc. 23 at 9.) The BIA approved this amendment to the lease despite Eagle Bear's repeated lease violations. (Doc. 12-3.) Eagle Bear then mortgaged its leasehold interest dated May 1, 2007, to secure a $500,000.00 loan from Independence Bank. (Doc. 33-8.) Eagle Bear used this loan to construct a swimming pool, hot tub, and water park at the Campground.

(Doc. 29 at 5.) Again, nothing in the record suggests that the Blackfeet Nation lacked knowledge that Eagle Bear constructed these improvements.

### 1. Late Payments in 2008.

The BIA sent Eagle Bear a show cause notice on January 15, 2008, when Eagle Bear's 2007 rent payment was forty-six days delinquent. The BIA's notice provided the following warning to Eagle Bear: "[y]ou are advised to make payment for this lease, or show cause why your lease should not be cancelled for non-payment of the rent due." (Doc. 33-12.) Eagle Bear did not pay. The BIA sent a second notice to Eagle Bear on March 27, 2008—Eagle Bear's 118th day of delinquency—stating "[y]ou are advised to make payment *within 10 days of this notice* or show cause why your lease should not be cancelled for non-payment of the rent due." (Doc. 33-20) (emphasis added). The record contains no response from Eagle Bear to the second notice and no indication of payment from Eagle Bear in reply to the second notice.

The BIA sent Eagle Bear a third notice on April 4, 2008, the 126th day that its rent was past due, in which the BIA reiterated the ten-day period warning. (Doc. 33-25.) The record indicates that Independence Bank also received this letter. (Doc. 46-5.) Independence Bank appears to have communicated with Eagle Bear regarding the risks to their mortgage interest: "Discussed [the ten-day notice letter] with Will Brooke on 4-7-08. Brooke indicates the BIA does this almost every year. He says payments have been made, but the BIA always has difficulty in applying them

19

appropriately. He is in communication with them, and expects to have resolved in the very near future." (Doc. 46-5.); (Doc. 28 at 15); *see also* (Doc. 75-1.) The record reveals no evidence that Independence Bank took any other action to protect its interest regarding Eagle Bear's lease violation. Contrary to the assurances made to Independence Bank, Eagle Bear failed to respond or pay for a third time. No party explained to the Court's satisfaction why Independence Bank had received notice of the ten-day letter sent on April 4, 2008, but no notice of other actions taken regarding the letter.

### 2. Lease Cancellation.

The BIA finally took action on the 193rd day without having received Eagle Bear's payment. This action came seventy-five days after the BIA's initial ten-day notice and sixty-three days after the BIA's third notice. The BIA Blackfeet Agency Superintendent cancelled the lease between Eagle Bear and the Blackfeet Nation on June 10, 2008. (Doc. 34.) The BIA Superintendent informed Eagle Bear in writing "that this lease is hereby cancelled." (*Id.*) The BIA's cancellation letter included the grounds for the cancellation, the amount that Eagle Bear owed, and Eagle Bear's right to appeal the decision. (*Id.*) The letter informed Eagle Bear that it could file an appeal of the cancellation with a statement of reasons to the BIA's Rocky Mountain Regional Director within thirty days. (*Id.*) The cancellation letter did not include the Blackfeet Nation with the "cc: Blackfeet Tribe" notation at the bottom left of the

letter. (*Id*.) The Court has found no other information in the record to indicate whether the Blackfeet Nation received notice of the BIA's June 10, 2008 lease cancellation letter.

### 3. Eagle Bear's Appeal.

Eagle Bear timely appealed the lease cancellation decision to the BIA Rocky Mountain Regional Director on June 18, 2008. (Doc. 34-6.) Eagle Bear sent its notice of appeal to the Blackfeet Nation by certified mail. (Doc. 29-13 at 5); (Doc. 29-2 at 10.) A Blackfeet Nation security officer signed for the mail. (Doc. 29-13 at 5); (Doc. 29-2 at 10.) The Blackfeet Nation's receipt of this mail indicates that the Blackfeet Nation knew of the appeal. Eagle Bear explained that it had submitted its lease payments for the previous few years "after the summer camping season begins in late May or June." (Doc. 29-13) Eagle Bear submitted its late rent payment to the BIA in trust for the Blackfeet Nation on the same day that it filed the appeal on June 18, 2008. (*Id.*) Nothing in the record indicates that Eagle Bear served Independence Bank with copies of the appeals documents that the regulations required. *See* 25 C.F.R. § 2.12 (2008). The record similarly fails to show whether Independence Bank filed any appeal.

The BIA's Rocky Mountain Region Director carbon copied the Chairman of the Blackfeet Nation on a June 25, 2008 Memorandum to BIA's Superintendent of the Blackfeet Agency discussing the Eagle Bear lease cancellation appeal. (Doc. 31

at 11.) BIA realty employees exchanged emails internally re "Will Brooke, President, Eagle Bear, Inc Appeal" between October 27, 2008, and January 7, 2009. (Doc. 91-1); (Doc. 91-2); (Doc. 91-3); (Doc. 91-4.) The exchanges began with an inquiry by Bernadine Pease, realty specialist in the BIA's Rocky Mountain Regional Office, (Doc. 105-3 at 7), as to the status of Eagle Bear's appeal of the lease cancellation, (Doc. 91-1 at 1). Tracey Tatsey, realty specialist in the Realty Office of the BIA's Blackfeet Agency, (Doc. 29-16 at 10), answered that she had heard "unofficially from the Tribe" that the Eagle Bear lease cancellation could "hinder" separate lease negotiations with Brooke. (*Id.*) Tatsey told Pease that she would "write to the B[lackfeet] Tribe and ask for an official standing." (*Id.*)

Pease emailed Tatsey on November 18, 2008, that she "need[ed] to know the status of this ASAP" and instructed Tatsey to "[e]ither send the administrative record or documentation from the tribe stating their intentions." (Doc. 91-2 at 3-4.) Tatsey responded that the administrative record had been sent to the BIA's Rocky Mountain Region on August 22, 2008. (Doc. 91-2 at 3.) Tatsey added that, although Mark Magee told her that the Tribe was "in support of Eagle Bear," she "[had] been unsuccessful in getting that in writing." (*Id.*) Mark Magee served at the time as the Director of the Blackfeet Nation's Land Department. (Doc. 29-3 at 2.) Tatsey then asked Pease whether she needed Tatsey to "do anything more" and Tatsey said that

22

she would contact the Blackfeet Nation once again to request "documentation." (Doc. 91-2 at 3.)

Magee spoke to Tatsey "once or twice" about the Eagle Bear campground, but Magee did not testify as to when those conversations occurred. (Doc. 29-3 at 4.) Magee did not recall talking to Tatsey or BIA Blackfeet Agency Superintendent Pollock in 2008 about Eagle Bear's late rent payments or to any BIA employee about the decision to cancel Eagle Bear's lease. (*Id*. at 7.) Magee also did not recall anyone talking to him about whether the Blackfeet Nation supported lease cancellation, opposed lease cancellation, or took any position on the issue. (*Id*. at 8.)

Pease replied to Tatsey on December 4, 2008, to inquire as to what she had learned. (Doc. 91-2 at 2-3.) Tatsey responded that she had spoken again to Magee and that he was going to talk to "one of the Council" that day and "get back to" her. (Doc. 91-2 at 2.) Magee testified that he never received authority from the Blackfeet Tribal Business Council to make any decision amending the Eagle Bear lease. (Doc. 29-3 at 10.)

Pease replied to Tatsey on December 11, 2008, that "[a]ll [she] need[ed was] a statement from Will Brooke indicating he has decided to cancel his appeal." (Doc. 91-2 at 1.) Tatsey emailed back that she had spoken to Brooke by phone. (*Id.*) Tatsey testified that she did speak with Brooke about the Eagle Bear appeal in 2008 and "must have" asked him to cancel it. (Doc. 105-2 at 11.) Tatsey wrote Pease that

23

Brooke "will send in this statement, and I will forward it to you." (Doc. 91-2 at 1.) Pease inquired of Tatsey on December 30, 2008, "[d]o you know if Mr. Brooke sent in his statement cancelling his appeal?" (Doc. 91-4 at 1.)

### 4. Eagle Bear's Withdrawal of its Appeal.

Eagle Bear withdrew its appeal five days after the December 30, 2008 email between Tatsey and Pease on January 5, 2009. (Doc. 34-13 at 1.) Brooke wrote that Eagle Bear withdrew the appeal "since I have been advised by the Bureau that all of our annual payments required under the lease have been made to the Bureau and cashed by the Bureau." (*Id.*) Brooke continued, "[a]ccordingly, the lease is current." (*Id.*) Eagle Bear carbon copied "Mark McGee" [sic] on the withdrawal letter. (*Id.*) Eagle Bear produced a return receipt of the appeal withdrawal letter delivered to Stephen Pollock, the Superintendent of the BIA's Blackfeet Agency. (Doc. 34-13 at 4.) Eagle Bear has produced no similar proof of delivery of the appeal withdrawal letter to Magee or any other Blackfeet Nation official. Eagle Bear can cite only to the notice of carbon copy to "Mark McGee [sic]" at the bottom of the letter.

On January 7, 2009, Tatsey replied to Pease's December 30, 2008 email that she "just received the correspondence today" and would "get in the mail towmorrow [sic]." (Doc. 91-4 at 1.) The "correspondence" cited by Tatsey apparently refers to Eagle Bear's letter dated January 5, 2009, to withdraw its appeal. The January 7, 2009, email represents the final email between BIA realty employees relating to the

2008 Eagle Bear lease cancellation appeal that is contained in the record. Nothing in the record indicates, however, whether the BIA took any official action at any level to rescind its decision to cancel the lease. The record remains devoid of any written memorialization of any such rescission even in the form of a cursory note or email. Tatsey testified that she did not know what would have been the effect of Eagle Bear cancelling its appeal. (Doc. 105-2 at 10.) Magee testified that he did not recall discussing the Eagle Bear Campground at any time with BIA Rocky Mountain Regional Director Ed Parisian. (Doc. 29-3 at 5.)

The BIA failed to evict Eagle Bear as a trespasser following the 2008 lease cancellation. The record reflects that Eagle Bear continued to operate "openly and obviously" as if the lease remained in effect after January 5, 2009. (Doc. 29 at 24.) Eagle Bear continued to make, and the BIA continued to accept, the lease's required annual rent and royalty payments each year since 2009. (Doc. 19 at 24.) Eagle Bear invested substantial sums in the facility after the apparent lease termination. (Doc. 29 at 5.)

The Blackfeet Nation also failed to object to Eagle Bear's continuing presence on the Indian trust land and its operation of the Campground until 2017. (Doc. 30-3.) The Blackfeet Nation knew of Eagle Bear's expenditures on the Campground improvements during the period after the lease cancellation between 2008 and 2017. (Doc. 29-3 at 8.) The record contains no indication that the Blackfeet Nation ever

raised any objection to Eagle Bear's construction of the improvements based on the lease cancellation or for any other reason.

Independence Bank likewise appears to have taken no steps to protect its loans to Eagle Bear other than to contact Will Brooke and make a handwritten note of the conversation at the bottom of Independence Bank's copy of the BIA's lease cancellation letter. (Doc. 46-5); (Doc. 75-1.) The terms of the loan agreement between Eagle Bear and Independence Bank and Independence Bank's status as an "approved encumbrancer" with third-party beneficiary rights under the lease required Independence Bank to receive notice of the lease cancellation. (Doc. 2-9 at 3); 25 C.F.R. § 2.12 (2008). The record contains no evidence Independence Bank received notice of the lease cancellation beyond its receipt of the ten-day notice letter sent on April 4, 2008. (Doc. 46-5.)

### 5.  2017 Lease Dispute.

The Blackfeet Nation eventually complained of several new material breaches of the lease by Eagle Bear and nearly a decade later on August 7, 2017, requested that the BIA cancel the lease. (Doc. 2-3 at 1.) The BIA Blackfeet Agency Superintendent initially required mediation. (Doc. 2-5 at 4.) Both the Blackfeet Nation and Eagle Bear appealed the mediation requirement. (Doc. 2-6 at 1.) The BIA Blackfeet Agency Superintendent altered his judgment and determined on October 17, 2017, that the lease should be cancelled. (*Id.*) Eagle Bear timely appealed the

BIA Blackfeet Agency Superintendent's decision to the BIA Rocky Mountain Regional Director. (Doc. 2-9.) The Acting BIA Rocky Mountain Regional Director overturned the 2017 lease cancellation on April 4, 2019. (Doc. 2-10.) The Acting BIA Rocky Mountain Regional Director instead ordered mediation and arbitration. (*Id.*)

Nothing in the record of these proceedings demonstrates that any of the Parties—the BIA, the Blackfeet Nation, or Eagle Bear—seemed to doubt that the lease had been in effect since 2008. Nothing in the record indicates that Eagle Bear served copies of its 2017 appeal documents on Independence Bank as required by the terms of its loan agreement and the corresponding federal regulations based upon Independence Bank's status as an "approved encumbrancer" with third-party beneficiary rights under the lease. (Doc. 2-9 at 3); *see* 25 C.F.R. § 2.12 (2008).

The Blackfeet Nation appealed the Regional Director's decision to the Interior Board of Indian Affairs ("IBIA"). (Doc. 2-11.) The IBIA denied expedited consideration of the issue (Doc. 2-12) and the appeal did not progress until July 2021 (Doc. 2-14). The Blackfeet Nation discovered information during the lease renewal proceedings before the IBIA that caused it to believe that the BIA had cancelled the lease in 2008. *Id.*; *see* (Doc. 2-14 at 1.) The Blackfeet Nation, believing that the BIA's 2008 lease termination became final following Eagle Bear's withdrawal of appeal, filed a complaint in Blackfeet Tribal Court and a motion to dismiss as moot

its appeal with the IBIA. (Doc. 2-14 at 1.) The IBIA denied the motion to dismiss on

August 10, 2021, and instead stayed the appeal and remanded the proceedings before

it to the BIA Rocky Mountain Regional Director to act on the Blackfeet Nation's

request that the BIA either honor the June 10, 2008 cancellation or produce evidence

that the cancellation had been reversed. (Doc. 43 at 1-2); (Doc. 46.) The IBIA has

taken no further action on the appeal since 2021. Nothing in the record indicates that

the BIA Rocky Mountain Regional Director has taken any action since the 2021

remand of the IBIA appeal to resolve the lease cancellation dispute. The IBIA and

the BIA Rocky Mountain Regional Director instead have left it to this Court to

determine the status of the lease.

## PROCEDURAL BACKGROUND

Eagle Bear and Brooke (collectively, "Plaintiffs") brought this action against

the Blackfeet Tribal Court and the Blackfeet Indian Nation ("Blackfeet Nation").

Plaintiffs seek declaratory and injunctive relief to prevent the Blackfeet Tribal Court

from exercising jurisdiction over their dispute with the Blackfeet Nation. *See Eagle*

*Bear v. Blackfeet Indian Nation*, 4:21-cv-88-BMM, (Doc. 1.)

This dispute centers upon the lease agreement between Eagle Bear and the

Blackfeet Nation. The Parties entered into that lease agreement on April 11, 1997.

*Id.*, (Doc. 29-1.) The lease provided Eagle Bear with 53.6 acres of tribal trust land

to operate a KOA campground within the exterior boundaries of the Blackfeet

Nation Indian Reservation for a period of 25 years. *Id.*, (Doc. 29-1 at 2.) Eagle Bear sought to renew the lease in 2017. The Blackfeet Nation opposed Eagle Bear's efforts to renew the lease.

The Blackfeet Nation, under the belief that the BIA had terminated the lease in 2008, filed suit against Eagle Bear in Blackfeet Tribal Court. *Id.*, (Doc. 2-2.) The Blackfeet Nation's complaint sought the following relief: (1) illegal trespass seeking eviction; (2) accounting of Plaintiffs' rents and profits since June 10, 2008; (3) unauthorized use of Blackfeet Nation lands seeking illegally gained profits; (4) fraudulent misrepresentation seeking illegally gained profits; and (5) failure to follow the laws of the Blackfeet Nation, seeking damages. *Id.*

Plaintiffs promptly brought this action. Plaintiffs sought a preliminary injunction to enjoin the Blackfeet Nation from pursuing its claims and to enjoin the Blackfeet Tribal Court from considering or resolving those claims. *Id.*, (Doc. 4.) The Court denied Eagle Bear's motion for a preliminary injunction because the record before the Court required the determination that the lease agreement between Eagle Bear and the Blackfeet Nation had been cancelled. *Id.*, (Doc. 27.) The Court noted, however, that the record before it appeared incomplete and that the Parties were expected to continue developing the record before the Court would reach a final decision. *Id.*

The Blackfeet Nation filed a Motion to Dismiss on September 17, 2021. *Id.*, (Doc. 21.) The Court held a hearing on the motion on January 19, 2022. *Id.*, (Doc. 16.) The Court postponed ruling on the Blackfeet Nation's motion to ensure full development of the record. *See id.*, (Doc. 47); *see also id,* (Doc. 53.) The Parties have continued to supplement and clarify the record.

Eagle Bear then sought a second preliminary injunction on May 6, 2022. *Id.*, (Doc. 50.) The Court scheduled a hearing on that motion for May 24, 2022. *Id.*, (Doc. 52.) Eagle Bear filed a chapter 11 bankruptcy petition in the U.S. Bankruptcy Court for the District of Montana ("Bankruptcy Court") the day before that hearing. *Id.*, (Doc. 55.) The Court vacated the preliminary injunction hearing at Eagle Bear's request. *Id.*, (Doc. 58.)

The Bankruptcy Court determined that the lease constituted part of Eagle Bear's bankruptcy estate because this Court had not conclusively ruled whether the lease had been cancelled in 2008. *In re Eagle Bear, Inc.*, 4:22-bk-40035-BPH (Bankr. D. Mont. May 31, 2022), (Doc. 30 at 4-7). The Bankruptcy Court applied the automatic stay provision set forth in 11 U.S.C § 362(a) to the lease. *Id.* The Bankruptcy Court also granted intervenor status to Independence Bank, as one of Eagle Bear's mortgagees and an approved encumbrancer under the lease. *Id.*, (Doc. 42.)

The Blackfeet Nation moved to withdraw the reference to the Bankruptcy Court as it relates to the resolution of the 2008 lease cancellation. *Eagle Bear, Inc. et al. v. Blackfeet Indian Nation et al.*, 4:21-cv-88-BMM, (Doc. 72-2.) The Court granted removal and severed Claim 1, whereby Eagle Bear sought confirmation that the lease was not effectively cancelled in 2008, from the adversary proceeding. The Court opened the case of *Eagle Bear, Inc. v. Blackfeet Indian Nation*, 4:22-cv-93-BMM, on September 26, 2022. (Doc. 1.)

Independence Bank also moved to intervene in this case. (Doc. 11.) Independence Bank alleges that it stands as an "approved encumbrancer" with third-party beneficiary rights under the lease based upon Eagle Bear having granted Independence Bank a $500,000 mortgage of its leasehold interest in the lease. (Doc. 12 at 2.) The Court granted Independence Bank's Motion to Intervene on December 1, 2022. (Doc. 39.) Independence Bank filed its Intervenor Complaint the same day. (Doc. 40.) The Blackfeet Nation filed a Motion to Dismiss Independence Bank's Intervenor Complaint. (Doc. 58.)

Following the bankruptcy stay, the Blackfeet Tribal Court ruled on Eagle Bear's pending motion to dismiss on January 3, 2023. *See In re Eagle Bear, Inc.*, 4:22-bk-40035-BPH, (Doc. 155-1.) Eagle Bear then moved the Bankruptcy Court to void the Blackfeet Tribal Court order for violation of the stay and to sanction the Blackfeet Nation. *Id.*, (Doc. 155.) The Bankruptcy Court has continued the motion

31

until this Court's decision regarding the underlying putative lease. *Id.*, (Doc. 179.) The status of the Blackfeet Tribal Court proceeding remains unclear. *See* 2021-CA-55, *Blackfeet Nation v. Eagle Bear, Inc. and William M. Brooke*. The Blackfeet Nation filed a proof of claim in the Bankruptcy Court in which it sought to recover allegedly unpaid taxes and interest on the late lease payments. *In re Eagle Bear, Inc.*, 4:22-bk-40035-BPH, (Doc. 229-1); *In re Eagle Bear, Inc.*, 4:22-bk-40035-BPH, (Doc. 230). The Bankruptcy Court issued a Memorandum Opinion as to the proof of claim finding that Eagle Bear owes a lodging tax debt to the Blackfeet Nation. *Id.*, (Doc. 248). The parties stipulated to the lodging tax amount due, *Id.*, (Doc. 254), and the Bankruptcy Court issued an Order Resolving Objection to Proof of Claim Number 11. *Id.*, (Doc. 255.) The Bankruptcy Court issued an administrative order on December 5, 2023. *Id.*, (Doc. 262.) The Bankruptcy Court determined that Eagle Bear's pending chapter 11 reorganization and disclosure statement will be held in abeyance pending a decision by this Court regarding the status of the lease. *Id.*

Eagle Bear, the BIA, Blackfeet Nation, and Independence Bank each have filed motions for summary judgment. (Doc. 22); (Doc. 24); (Doc. 64); (Doc. 27); (Doc. 43.) The Court held a hearing on the motions on January 4, 2023. (Doc. 73.) The BIA moved to dismiss Intervenor Independence Bank's Complaint for lack of jurisdiction following this hearing. (Doc. 81.)

Eagle Bear provided the Court notice on April 4, 2023, of documents it recently had obtained from the BIA. (Doc. 91.) The documents were not previously cited because the BIA did not produce the documents until March 31, 2023. *Eagle Bear v. Blackfeet Indian Nation*, 4:21-cv-88-BMM, (Doc. 42-2.) Eagle Bear moved the Court for leave to conduct additional discovery based on the content of those documents, which represented an email correspondence between BIA staff regarding the Eagle Bear lease cancellation appeal and withdrawal. (Doc. 92); (Doc. 93 at 7-10.) Some relevant BIA staff had not been deposed previously. (Doc. 93 at 4, 9, 12.) The Court granted Eagle Bear's motion and deferred ruling on the pending motions for summary judgment. (Doc. 98.) The Court ordered the Parties to complete additional discovery and file supplemental summary judgment briefing no later than June 2, 2023. (*Id*. at 5.)

Eagle Bear then moved the Court for additional time to complete supplemental discovery and briefing, requesting an extension until July 14, 2023. (Doc. 99); (Doc. 100 at 6.) Eagle Bear argued that the BIA had failed to produce additional documents responsive to Eagle Bear's discovery request. (Doc. 100 at 2.) Blackfeet Nation opposed the motion. (Doc. 101.) The BIA and Independence Bank indicated that they did not oppose the motion. (Doc. 99 at 2); (Doc. 101.) Blackfeet Nation filed its response, as well as a notice to the Court regarding further information that pertained to the relevance of the BIA emails. (Doc. 101.) The Court

granted, in part, and denied, in part, Eagle Bear's request. The Court ordered the Parties to complete additional discovery and file supplemental briefing no later than June 23, 2023. (Doc. 104 at 10.)

The Parties filed supplementary briefing pursuant the orders on BIA's belated production. (Doc. 105); (Doc. 106); (Doc. 107); (Doc. 108); (Doc. 109); (Doc. 110); (Doc. 111.) This Court held a hearing on the additional discovery and corresponding supplementary briefing on October 12, 2023. (Doc. 121.) The Court has evaluated the Parties' briefs, oral arguments, and the now expanded record before it. The Court determines that the BIA cancelled the April 11, 1997 lease between Eagle Bear and the Blackfeet Nation in 2008. The cancellation became effective thirty days after Eagle Bear withdrew its Notice of Appeal on January 5, 2009. 25 C.F.R. §§ 2, 162 (2008); (Doc. 34-13.) The Court accordingly will grant the Blackfeet Nation's Motion for Summary Judgment. (Doc. 27.)

## STANDARD OF REVIEW

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must view the evidence "in the light most favorable to the opposing party" in deciding whether a genuine dispute exists as to a material fact. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The opposing party cannot avoid summary judgment, however, by "mere allegations or denials" and

must, instead, "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

### I.   The Court will grant the Blackfeet Nation's Motion for Summary Judgment

The claims presented by Plaintiffs and Intervenor Plaintiff Independence Bank depend upon the continued existence of the 1997 lease between Eagle Bear and the Blackfeet Nation.

### A. 2008 Lease Cancellation

#### i.   The BIA cancelled the lease pursuant to the applicable regulations controlling business leasing of Indian trust land.

Other than repeatedly providing Eagle Bear excess time to pay its delinquent debts and failing to consult directly with the Blackfeet Nation, the BIA followed regulatory procedure in this case when canceling the lease between Eagle Bear and the Blackfeet Nation in 2008. Eagle Bear was more than five days delinquent on its 2007 rent payment. (Doc. 33-12 at 1); *see* 25 C.F.R. § 162.614 (2008). The BIA provided to Eagle Bear three ten-day notices of cancellation. (Doc. 33-12); (Doc. 33-20); (Doc. 33-25); *see* 25 C.F.R. § 162.614 (2008). Independence Bank received at least one of these notices and took no action after consulting with Eagle Bear. (Doc. 46-5); (Doc. 75-1 at 3-4.) Eagle Bear failed to cure its violation within the first, second, or third ten-day period designated by the BIA. The BIA ultimately

exercised its authority to cancel the lease on June 10, 2008. (Doc. 34 at 3); *see* 25 C.F.R. § 162.618 (2008).

### ii. Eagle Bear did not cure its 2007 default by submitting payment to the BIA after lease cancellation.

Eagle Bear argues that its $15,000 payment on June 16, 2008, represents a timely cure to the 2007 default. Eagle Bear's 2008 payment admittedly did not include the interest accrued on its 2007 delinquent rental payment. (Doc. 108 at 25.) The BIA accepted and cashed Eagle Bear's check only days after Eagle Bear had received the June 10, 2008 cancellation letter. (Doc. 23 at 33.) Eagle Bear calculates the asserted timeliness of its payment from the date of its receipt of the June 10, 2008 cancellation letter. (*Id*.) Eagle Bear misunderstands the regulations.

The BIA may cancel a lease according to the regulations governing business leases on Indian trust land. This cancellation authority exists regardless of whether a tenant, such as Eagle Bear, attempts to cure its violation outside the regulatorily-defined timeline or process for so doing. *See Tuttle v. Jewell*, 168 F. Supp. 3d 299, 309-10 (D. D.C. 2016), *aff'd sub nom. William Tuttle v. Ryan Zinke, et al.* (Apr. 27, 2016); *see also* 25 C.F.R. §§ 162.618, 162.619(a) (2008). The BIA provided Eagle Bear with ten days from receipt of the BIA's show cause letter dated March 27, 2008, in which to cure its delinquent 2007 payment. (Doc. 33-20.) Eagle Bear's payment eighty-one days later, on June 16, 2008, does not allow it to circumvent

the requirement it was under to cure violations within ten business days of the notice of violation. 25 C.F.R. § 162.251 (2008). Eagle Bear also failed to include payment of interest that had accrued on its 2007 delinquent rental payment during the eighty-one-day period. (Doc. 108 at 25.)

### iii.   The BIA did not overturn the lease cancellation before Eagle Bear withdrew its appeal.

Eagle Bear filed a timely appeal of the lease cancellation. (Doc. 29-13.) The BIA Rocky Mountain Regional Director possessed the authority in the relevant period to overturn the lease cancellation. *See* 25 C.F.R. § 2.4 (2008). The BIA Rocky Mountain Regional Director could have exercised this power by deciding Eagle Bear's appeal. *Id*. Federal regulations would have required that the BIA Regional Director render a *written* decision in the appeal. *Compare* (Doc. 35-14) (April 4, 2019, letter signed by Acting BIA Rocky Mountain Regional Director, stating, "It is my decision to overturn the decision of the Superintendent [to cancel the lease.]") "Area Directors [. . .] *shall* render *written* decisions *in all cases appealed to them* within 60 days after all time for pleadings (including all extensions granted) has expired." 25 C.F.R. § 2.19 (2008) (emphasis added).

BIA staff reporting to the BIA Rocky Mountain Regional Director did not possess the same authority to undo the lease cancellation as did the BIA Regional Director. Nothing in the regulations authorize a realty specialist in the realty office

of the BIA Blackfeet Agency, or a realty specialist in the BIA Regional Office, unilaterally to overturn the lease cancellation. Any representation by a BIA realty employee, oral or written, to Eagle Bear would have been impotent to bind the BIA to any change as to the cancelled lease.

Eagle Bear argues that the BIA Rocky Mountain Regional Director, in fact, made a decision to overturn the lease but there was no writing, or the writing has been lost. Eagle Bear points to what it characterizes as circumstantial evidence of the decision: Mark Magee testified that it was his understanding that the lease remained in full force and effect after 2008 (Doc. 29-3 at 9); BIA regional office employee Jodi Wagner testified that it was her understanding that the result of Eagle Bear cancelling its appeal would have been that the lease would remain in effect (Doc. 105-1 at 13); Tracy Tatsey testified that Eagle Bear's lease was not cancelled after January 5, 2009, because "[i]t's still in effect" (Doc. 105-2 at 11); and Bernadine Pease testified that it was her understanding that Brooke would move forward with the lease after withdrawing the Eagle Bear appeal (Doc. 105-3 at 20). To imbue hazy memory, on-the-ground status quo appearances, and historical innuendo with the force of law when federal statutory law applies to a question, however, would conflict with the promise of the federal trust responsibility. *See McGirt v. Oklahoma*, 591 U.S. __, 140 S. Ct. 2452 (2020). The Court observes that

at times federal Indian law produces seemingly unfair or counterproductive results. The law, built to serve tribal peoples, governs.

Eagle Bear's evidence almost certainly would constitute a healthy crumb of factual dispute in a run-of-the-mill lease dispute. In fact, Eagle Bear's evidence likely would create a genuine issue of material fact as to whether the lease cancellation was later upended and perhaps enough to entitle Eagle Bear to relief. The Court notes that were Eagle Bear able to muster a relevant official written record produced by the BIA, Eagle Bear's suit would likely survive this summary judgment stage. We do not face a run-of-the-mill lease dispute. Federal statutes and regulations governed this lease.

Only a *written* decision in Eagle Bear's appeal properly rendered by the BIA Rocky Mountain Regional Director could overturn the lease cancellation. 25 C.F.R. § 2.19 (2008). No party has provided evidence in the record that such written decision exists. BIA Rocky Mountain Regional Director Edward Parisian instructed Eagle Bear in writing on July 25, 2008, that "[a] decision will be forthcoming within 60 days from the date this office has all the information before it to adequately render its decisions in this matter." (Doc. 31-10.) Parisian was paraphrasing 25 C.F.R. § 2.19 (2008) which set the 60-day timeframe. A decision would have been in writing and, according to BIA employee Jodi Wagner, "would have been placed with the file [corresponding to the appeal]." (Doc. 105-1 at 12.) Nothing in the record

indicates that Parisian ever rendered a "decision" as to the lease cancellation appeal and no party has produced any such writing from the file.

### iv.   Eagle Bear's withdrawal of the appeal rendered the lease cancellation effective.

Eagle Bear argues that the cancellation never became effective in the first place. (Doc. 118.) Eagle Bear asserts that the lease survived without requiring revival from BIA Rocky Mountain Regional Director Parisian because the cancellation "remain[ed] ineffective" once Eagle Bear appealed the BIA Blackfeet Agency Superintendent's cancellation decision. (*Id*.) Eagle Bear first points to the language of 25 C.F.R. § 162.621 (2008) that a decision "remain[s] ineffective" once an appeal has been filed. Eagle Bear contends that this language requires the Court to find that an appeal stops a challenged decision from taking effect until and *unless* the appealed-to BIA official resolves the appeal. (Doc. 118.)

Section 162.621 of Title 25 of the Code of Federal Regulations (2008) provided that "[a] cancellation decision [involving a lease] will remain ineffective if the tenant files an appeal under § 162.620 of this subpart and part 2 of this chapter, unless the decision is made immediately effective under part 2." Nowhere in 25 C.F.R. § 162 (2008) do the regulations contemplate withdrawal of such an appeal, let alone the effect of such a withdrawal. The drafters of the 2008 C.F.R. failed to account for the possibility that a party might appeal a decision and subsequently

withdraw its appeal before a final decision could be made by the relevant BIA regional director.

Eagle Bear's proposed construction of the section would run contrary to the purpose of 25 C.F.R. (2008). "[A] court must carefully consider the text, structure, history, and purpose of a regulation" in the process of regulatory construction. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415, 204 L. Ed. 2d 841 (2019). A blindered reading of the regulations would invite gamesmanship by Indian and non-Indian parties alike and make BIA slip-ups more likely to injure the interests of Indian peoples. For example, to allow a party to a lease, first, unilaterally to stay a BIA decision merely by filing an appeal and, second, unilaterally to make that stay de facto permanent by withdrawing the appeal would destroy the regulatory framework built to facilitate leasing from Native nations. A diligent BIA Regional Director could not be expected to issue a decision in the time it would take a bad faith party to play this two-step procedural trump card.

Nothing in the facts before the Court indicates that Eagle Bear contemplated such a procedural end run. To construe the regulations as Eagle Bear proposes, however, would run contrary to the overarching purpose and structure of the C.F.R. part. Nothing in the record suggests, and no party argues, that BIA Blackfeet Agency Superintendent Pollock invoked the "effective immediately" provision of 25 C.F.R.

41

2.6(a) (2008) in this instance. *See* (Doc. 31-11); *see also* (Doc. 31-12.) The provision remains relevant.

The provision catalogues what specific policy considerations could justify a BIA official's decision to make an initial BIA decision immediately effective. A decision could be made effective immediately if "public safety, protection of trust resources, or other public exigency require[d.]" 25 C.F.R. § 2.6(a) (2008). The continued use of the Blackfeet Nation trust land by Eagle Bear clearly has hindered the protection of trust resources. Eagle Bear paid royalties late in the years following the 2008 cancellation, as in the years preceding it. *See* (Doc. 51 at 60) ("Eagle Bear made the payments demanded in the August 8 [sic], 2017 show cause letter" but did not pay interest); *see also* (Doc. 35-11) (August 7, 2017 show cause letter). The Blackfeet Nation's belief that its trust resources were inadequately protected spawned this controversy. The policy considerations inherent in 25 C.F.R. § 2.6(a) (2008) suggest a construction of the regulations that effectuates the protection of trust resources as a paramount goal. The protection of trust resources sometimes justifies limitations or foreclosures of potential procedural channels for challenging a BIA decision.

The structure of the process described in 25 C.F.R. § 162.621 (2008) itself reveals a purpose to effectuate efficiently any unchallenged BIA lease cancellation decision. The subpart states that "[i]f an appeal is not filed [. . .], the cancellation

42

decision will be effective on the 31st day after the tenant receives the cancellation letter from us." 25 C.F.R. § 162.621 (2008). Read in concert with 25 C.F.R. § 2.19 (2008), which provided that "[a]rea [d]irectors [. . .] shall render written decisions in all cases appealed to them within 60 days after all time for pleadings[,]" the regulations indicate a purpose to dispatch of any impediment to a properly decided cancellation within a few months. This interpretation at least would speed the procedure required before appeal to the IBIA.

The lease cancellation in this instance became unchallenged when Eagle Bear withdrew its appeal. The apparent purpose of the regulations to effectuate quickly a lease cancellation untrammeled by any legal challenge supports a narrow reading of the phrase "[t]he cancellation decision will remain ineffective." This interpretation would not support the notion of staying the cancellation for all time. The interpretation instead would support the filing of a notice of appeal as a stay of the lease cancellation until it no longer faced legal challenge. The Court notes that such interpretation preserves the protection of the "remain ineffective" provision for parties who prosecute a legal challenge and do not voluntarily withdraw it as Eagle Bear did in this case.

Eagle Bear next argues that its withdrawal of the appeal had no legal effect on the lease status because no BIA official approved the withdrawal. (Doc. 118.) This argument relies on the idea that the ostensible withdrawal did not affect the appeal

process and again that the cancellation decision instead "remain[s] ineffective" because of 25 C.F.R. § 162.621 (2008). Eagle Bear withdrew its appeal on January 5, 2009, allegedly "pursuant to [its] discussions" with BIA realty staff and certainly of its own accord. (Doc. 34-13 at 1.) The regulations at issue do not address the withdrawal of an appeal to a BIA regional director. The Court looks to the text of other sections of 25 C.F.R. (2008) to resolve this apparent oversight in the regulatory scheme. *See Kisor*, 139 S. Ct. 2400 at 2415.

These other regulations contemplate voluntary withdrawal of a request for agency action relating to Indian lands. Individual Indian landowners, under the 2008 regulations, could withdraw an approved exemption of their land from the application of a tribal leasing policy "if the Indian owners [. . .] submit a written objection to [the BIA.]" 25 C.F.R. § 162.205 (2008); *see also* 25 C.F.R. § 166.101 (2008) (same withdrawal mechanism). In that section, the submission of a written document to the BIA, not some later BIA approval or acceptance of the document, affects the withdrawal. The same prudential and policy-grounded rule controls here in the absence of other agency interpretation. The testimony of BIA employee Jodi Wagner that employees in the BIA's regional office "needed to know" whether another BIA employee "was getting word that [the appeal] was going to be cancelled or withdrawn" further bolsters the conclusion that withdrawal of an appeal would not have been a BIA decision to make under the 2008 C.F.R. but a decision to be

made by the appealing party. (Doc. 105-1 at 11.) Eagle Bear's withdrawal had legal effect.

Eagle Bear's withdrawal of the appeal made the June 10, 2008 lease cancellation effective. Eagle Bear did file a notice of appeal before the time for filing a notice of appeal had expired. (Doc. 34-6.) This step immediately made the underlying cancellation ineffective. 25 C.F.R. § 162.621 (2008). Eagle Bear later withdrew that same notice of appeal. (Doc. 34-13.) Decisions of BIA officials become effective when the thirty-day time for filing a notice of appeal has expired and no notice of appeal has been filed. *See* 25 C.F.R. §§ 2.6(b), 162.621 (2008). Eagle Bear's withdrawal of its appeal on January 5, 2009, restarted the thirty-day clock. The BIA's decision to cancel the lease became final on February 5, 2009. *See* 25 C.F.R. §§ 2.6(b), 2.9, 162.621 (2008). The time for filing a Notice of Appeal had expired on that date and Eagle Bear had filed no new Notice of Appeal. *See* 25 C.F.R. § 2.6(b) (2008).

### v.   The cancelled lease was never revived once effectively cancelled by Eagle Bear's appeal withdrawal.

Eagle Bear contends that the testimony of the BIA officials involved in the appeal process confirm the lease's reinstatement. (Doc. 23 at 8.) Eagle Bear claims that Brooke discussed the appeal withdrawal with Tracy Tatsey, the Realty Specialist in the BIA Blackfeet Agency Superintendent's office. (Doc. 29-4 at 39.)

Eagle Bear alleges that Tatsey advised Brooke that he could withdraw the appeal with the lease remaining in effect. (*Id.*) Eagle Bear claims it understood that this direction came from the relevant BIA superintendent or regional director. (Doc. 23 at 25.)

Eagle Bear references the alleged discussion with a member of the BIA's realty staff, apparently Tatsey, in Eagle Bear's letter of January 5, 2009 withdrawing the Notice of Appeal. (Doc. 34-13.) The BIA failed to send a letter to Eagle Bear, or otherwise acknowledge in writing its receipt of the January 5, 2009 letter. (Doc. 23 at 23.) The BIA likewise took no steps to acknowledge, officially and in writing, Eagle Bear's discussions with BIA realty staff. The BIA nevertheless continued to perform as though the lease remained in effect until 2017.

This inaction by the BIA appears to run counter federal regulations: "If a tenant remains in possession after the expiration or cancellation of a lease, [the BIA] will treat the unauthorized use as a trespass. Unless [the BIA has] reason to believe that the tenant is engaged in negotiations with the Indian landowners to obtain a new lease, [the BIA] will take action to recover possession on behalf of the Indian landowners, and pursue any additional remedies available under applicable law." 25 C.F.R. § 162.623 (2008). BIA staff testified that they believed the lease remained in effect after Eagle Bear had withdrawn its appeal. (Doc. 105-

46

1 at 13); (Doc. 105-2 at 11.) This belief proves both mistaken and legally meaningless. "Actions by the local [BIA] agency contrary to the regulations and contrary to the best interest of [a tribe] do not create a vested right in [a] lease." *Gray v. Johnson*, 395 F.2d 533 (10th Cir. 1968).

The BIA lacks authority to revive a cancelled lease without the consent of the Blackfeet Nation. *See Moody v. United States*, 931 F.3d 1136, 1142 (Fed. Cir. 2019). The BIA's internal emails suggest a disregard for the Blackfeet Nation's decision-making province. On November 18, 2008, BIA realty staff sought the official position of the Blackfeet Nation on Eagle Bear's appeal of the lease cancellation (Doc. 91-2 at 3-4). BIA realty staff continued to seek documentation of the Blackfeet Nation's intentions through December 10, 2008. (*Id.* at 2-3.) The same staffers apparently abandoned the attempt to get any official word from the Blackfeet Nation as discussed in the email exchange between Tatsey and Pease. (Doc. 91-2.) And by December 11, 2008, the BIA staffers instead satisfied themselves with a letter from Eagle Bear. (Doc. 91-2 at 1.)

The Parties have produced no Blackfeet Tribal Business Council resolution similar to the resolution adapting the original lease in 2007 in support of reviving the lease. *Compare* (Doc. 33-6) (Blackfeet Tribal Business Council Resolution 228-2007, approved April 16, 2007, approving Eagle Bear's request for a leasehold interest to finance the installation of a swimming pool at Eagle Bear). Nothing in the

record shows that the Blackfeet Nation consented to the revival of the lease. *See* (Doc. 105-2 at 9) (Deposition of Tracey Tatsey that, if Mark Magee told her something was the position of the Tribe, "I can't say it was the position of the Tribe," but rather "I can say it was Mark Magee's position.") The lease was cancelled in 2008 when Eagle Bear withdrew its appeal. It was never revived.

*Moody* proves closely analogous. The plaintiffs in *Moody* failed to pay rent for agricultural leases on tribal lands. 931 F.3d at 1138. The BIA cancelled the leases for untimely payment. *Id.* The plaintiffs provided the BIA full payment for the past-due rents within the thirty-day appeal period. *Id.* at 1139. The BIA orally informed the plaintiffs that "they did not need to appeal, [and] could continue farming the land according to the leases." *Id.* The Federal Circuit determined that the BIA had cancelled the leases despite the BIA's oral representations. *Id.* at 1142.

The Federal Circuit reasoned that "[i]t is difficult to see how the United States, without specific authorization, could enter into an implied-in-fact contract [. . .] on behalf of the tribe." *Id.* "The BIA does not have general authority to lease land held for the benefit of a tribe unless it receives direct authorization from the tribe." *Id.* (citing 25 C.F.R. § 162.207(a) (2019)). The Federal Circuit determined that the plaintiffs could "not present any salient legal support for their position that the BIA can revive a cancelled lease without tribal authorization." *Id.*

Eagle Bear's actions based on the record presented mirror those of the plaintiffs in *Moody*. Eagle Bear immediately fell behind on its lease payments. (Doc. 17 at 6-8.) The BIA eventually cancelled the lease between Eagle Bear and the Blackfeet Nation for delinquent payment. (Doc. 29-13.) Eagle Bear made payment after the BIA had cancelled the lease and appears to have entered into an implied-in-fact contract similar to the one in *Moody*. (Doc. 29-13 at 4-5.) Eagle Bear similarly attempts to rely on oral representations by BIA employees suggesting that the lease would continue, (Doc. 23 at 25), or BIA officials' testimony that they never believed the lease had been cancelled, (Doc. 23 at 29–30).

The Federal Circuit in *Moody* rejected the argument that a lease persists based on the BIA's oral representations. 931 F.3d at 1142. Eagle Bear and the BIA remain bound by the BIA's administrative process and regulations. *See* 25 C.F.R. § 162. Federal regulations limit the authority of BIA officials to act on behalf of tribes. *G.H.G. v. Acting Rocky Mountain Regional Director*, 39 IBIA 27, 30 (2003). Even allegedly erroneous advice from a BIA superintendent's office cannot grant legal rights to a lessee inconsistent with the applicable regulations. *Flynn v. Acting Rocky Mountain Regional Director*, 42 IBIA 206, 212-13 (2006) (citing *Billco Energy v. Acting Albuquerque Area Director*, 35 IBIA 1, 7 (2000)).

Those dealing with agents of the federal government "assume[] the risk" that the agents act within the bounds of their authority. *Gray v. Johnson*, 395 F.2d

533, 537 (10th Cir. 1968). The BIA's apparent oral communications with Eagle Bear regarding the lease's reinstatement do not absolve Eagle Bear of its failure to understand BIA regulations. *See Moody*, 931 F.3d at 1142; *see also Flynn*, 42 IBIA at 212. The BIA possessed no authority to decide unilaterally that "Eagle Bear cured its alleged defaults of the [l]ease, [to] accept[] that cure, and [to] decide[] to 'move forward with the least in effect,'" as Eagle Bear now argues that the BIA did. (Doc. 68 at 7.)

### vi. The Parties' course of conduct cannot create an implied-in-fact contract for Indian trust land business leases.

Eagle Bear contends that the Parties' conduct and the context of the 2008 proceedings confirm that the BIA never cancelled the lease. (Doc. 23 at 8); (Doc. 29-4 at 39.) Eagle Bear argues that it still possesses its leasehold interest because the BIA, and the Blackfeet Nation, operated for the next nine years as though the lease remained in effect. This argument likely would prove persuasive under a standard commercial lease between non-Indian entities. *See Jackson, M & M Farms v. Portland Area Director, Bureau of Indian Affairs*, 35 IBIA 197 (2000). As discussed previously, however, the Parties did not operate pursuant to a standard commercial lease.

The general principles of contract law allowing for implied-in-fact contracts remain inapplicable here because federal regulations unequivocally govern Indian

trust land leasing. *See* 25 C.F.R. §§ 162.600 (2008) *et seq*; *Jackson, M & M Farms*, 35 IBIA 197. A lessee in *Jackson, M & M Farms* entered into a two-year business lease for 10.07 acres of trust land on the Fort Hall Indian Reservation in 1991. 35 IBIA at 197. The Fort Hall Agency BIA Superintendent approved the lease. *Id.* One year later, the lessee applied for a ten-year business lease of the same property. *Id*. The BIA failed to approve this ten-year lease application in writing. The BIA staff also erroneously recorded that the original two-year lease expired in 1997 rather than 1992. *Id*. The BIA billed the lessee for rental payments annually from 1991 to 1997—an additional five years after the lease term had expired—and the lessee made each of these payments. *Id*.

Individual Indian owners discovered the discrepancy in 1998. These tribal lessors directed the BIA Fort Hall Agency Superintendent to reject payments from the lessee because no valid lease had existed since 1992. *Id*. The BIA superintendent determined that the lease had expired in 1992 and that the plaintiff owed trespass damages for the six subsequent years. The lessee appealed, arguing that the regulations in 25 C.F.R. § 162 "do not prohibit holdover tenancies, and simply are silent on the subject, [. . . and that] the principles of general contract law that recognize holdover tenancies under these circumstances must be applied." *Id*. at 199.

The IBIA acknowledged that the BIA's actions "were misleading" because the agency had "bill[ed] the [plaintiff] for annual rent and accept[ed] payment from

him," and, therefore, "led the [plaintiff] to believe that it did not object to his presence on the property." *Id*. at 200. The IBIA nevertheless determined that general contract law principles proved irrelevant, given the governing federal statute's requirement that leases of Indian land be approved by the Secretary in writing. *Id*. at 199 (citing 25 C.F.R. § 162.5(a) (2000); 25 U.S.C. § 415). "The unapproved lease of Indian land is void and grants no rights to any party." *Id.*

The BIA, as in *Jackson, M & M Farms*, "owes a trust responsibility to the owner of trust land, which 'includes ensuring that trust land is not conveyed in violation of relevant statutes and regulations.'" *Flynn,* 42 IBIA at 213 (citing *DuBray v. Acting Aberdeen Area Director*, 30 IBIA 64, 68 (1996)). This trust obligation precludes the conclusion that an implied-in-fact contract existed following the 2008 lease cancellation in this case. It matters not whether Eagle Bear may have performed as a "good tenant" for the decade following its appeal withdrawal and that the Campground was by all accounts a KOA success. (Doc. 68 at 7); (Doc. 23 at 10.) It matters not whether the BIA, as it had in *Jackson, M & M Farms*, accepted, and deposited payments from Eagle Bear for several years under the mistaken belief that a valid lease existed. (Doc. 23 at 30.)

Eagle Bear and the BIA remain bound by the BIA's administrative process and regulations. *See* 25 C.F.R. § 162. The BIA lacked authority to revive or reinstate the lease after its termination without written approval of the Secretary and the

Blackfeet Nation's explicit consent. *See Jackson, M & M Farms*, 35 IBIA at 199; *see also* 25 U.S.C. § 415; 25 C.F.R. § 162. The lack of any written approval proves fatal to Eagle Bear's theory that Eagle Bear's lease existed through the Parties' continued performance under the lease. *Jackson, M & M Farms*, 35 IBIA at 199. A BIA official's conduct alone, without the backing of an official agency order, may never constitute an order to reinstate a lease. *Id*. The trust responsibility demands more of the BIA, acting as trustee on behalf of the Blackfeet Nation, than mere oral assertions regarding the fate of the tribe's lands held in trust by the United States. The Court reiterates that no valid lease existed between Eagle Bear and the Blackfeet Nation at any time following the 2008 cancellation. *See id.*

> **vii.    The BIA and the Blackfeet Nation stand under no obligation to accept a lessee's long-overdue cure of lease violations.**

Eagle Bear further asserts that the lease was not cancelled in 2008 because Eagle Bear timely cured the alleged default identified in the June 10, 2008 letter. (Doc. 23 at 33.) This argument once again likely would prove persuasive under a standard commercial lease between non-Indian entities. *See Tuttle*, 168 F. Supp. 3d. To reiterate once more, the Parties did not operate pursuant to a standard commercial lease.

The terms of the lease between Eagle Bear and the Blackfeet Nation and the regulations incorporated therein (Doc. 29-1) did not allow the BIA to cure Eagle

Bear's breach of the lease absent a waiver from the Blackfeet Nation. *See* 25 C.F.R.

§ 162.619(a)(1)-(4) (2008); *see also Tuttle*, 168 F. Supp. 3d at 312. The regulations

required the BIA to consult with the Blackfeet Nation to decide whether to cancel

the lease, invoke other remedies, or grant the tenant additional time to cure. *See* 25

C.F.R. §§ 162.619(a)(1)-(4) (2008). The Parties produced no evidence of any such

consultation with the Blackfeet Nation.

*Tuttle* confirms this regulatory requirement. 168 F. Supp. 3d. The plaintiff and

the Colorado River Indian Tribes ("Colorado River Tribes") entered into a 50-year

business lease of tribal trust land in 1977. *Id*. at 301. The lease provided it would be

governed by the "Code of Federal Regulations, Title 25—Indians" and explicitly

incorporated the pertinent regulations into the lease. *Id*. The BIA Superintendent of

the Colorado River Agency approved the lease pursuant to authority delegated to the

office. *Id*. at 302.

According to the lease terms, the plaintiff possessed the right to live on the

property and to use it for "commercial or community development and all uses

necessary to community development" for a term expiring in 2027. *Id*. In exchange,

the plaintiff agreed to pay a base rent annually, and, in advance, without prior notice

or demand, at a per-acre rate that increased incrementally throughout the lease term.

*Id*. The parties executed a modified lease in 1986 when the plaintiff decided to

develop the property for commercial use. The modified lease required that the lessee

pay a percentage rent in addition to the base rent, as well as provide an annual accounting to the BIA. *Id*. at 302-03.

The lessee stopped making payments to the Colorado River Tribes between 1994 and 1999. *Id*. at 303. When payments resumed in 1999, the Colorado River Tribes refused to accept payment. *Id*. The lessee challenged the 1986 modification. The parties reached a partial resolution in September 2004, whereby the lessee paid the overdue back rent and interest. *Id*. at 303. The relevant BIA regional director issued a decision on the lessee's challenge. The BIA regional director ruled that the modification constituted a valid, enforceable contract, that the lessee's prior breach had been cured, and that the lease remained "in full force and effect." *Id*. at 303-04. The BIA regional director also imposed interest on all late payments, including those the Colorado River Tribes had refused to accept. *Id*. at 304.

The plaintiff appealed to the IBIA. The IBIA upheld the BIA regional director's decision that the modification had been valid, but renewed the order that required the lessee to pay interest on rental payments he timely had tendered but that the Colorado River Tribes had refused to accept. *Id*. The IBIA remanded the case to the BIA regional director to determine the amount due to compensate the lessee for the overpayment of interest. *Id.* By a joint letter dated September 30, 2009, the Colorado River Tribes and the Superintendent informed the lessee that he was owed a credit in the amount of $10,504.79 toward the outstanding balance due under the

lease. *Id.* The lessee had failed to pay the base rent for 2005, 2006, and 2009. The modified lease provided that the credit would be applied and that these arrearages were offset for amounts due through March 21, 2009. *Id.*

The September 30, 2009 letter also included a Notice of Default, informing the lessee that he was in violation of the lease for the following reasons: (1) he had failed to pay percentage rent since March 1991; (2) he had failed to submit certified statements of gross business receipts for fiscal years 1992-2008; and (3) he had failed to provide proper proof of current public liability insurance and fire insurance. *Id.* The Notice of Default advised the lessee that, according to 25 C.F.R. § 162.618, he had ten days from receipt of the Notice of Default to: (1) cure the violations, (2) dispute the Notice of Default and/or (3) explain why the lease should not be canceled or request more time to cure. *Id.*

The lessee requested more time to respond to the Notice of Default due to health problems in a letter that the Colorado River Tribes received on October 13, 2009. *Id.* Several days later, the lessee sent a second letter that included an uncertified estimate of the gross receipts for business conducted on the property, together with payment of three percent of that estimate, which the lessee deducted from the monies owed to him. *Id.* The lessee included an invoice for a public liability insurance policy effective from September 18, 2009, through September 18, 2010. *Id.*

The BIA Superintendent of the Colorado River Agency sent the lessee a Notice of Cancellation of Lease by certified mail on March 2, 2010. *Id*. The Notice reiterated the lease violations that had been identified in the Notice of Default. *Id*. at 304. The Notice of Cancellation waived the lessee's default for failure to pay rent due through March 21, 2009, because the offset more than covered the outstanding base rent. *Id*. The Notice explained, however, that the lessee had failed to cure the other outstanding lease violations, as required by 25 C.F.R. § 162.618. *Id*.

The lessee timely appealed the Notice of Cancellation to the BIA Acting Western Regional Director on April 1, 2010, with a statement of reasons to explain why the cancellation had been in error. *Id*. at 305. The BIA acting regional director determined that the statement of reasons proved insufficient and affirmed the cancellation on July 19, 2010. *Id*. at 306. The lessee appealed to the IBIA. *Id*. The IBIA determined that the lessee had violated the lease and failed to timely cure. *Id.*

The District Court for the District of Columbia reviewed the plaintiff's Administrative Procedure Act challenge to the IBIA's ruling. The district court determined that the BIA appropriately had cancelled the lease and had not impermissibly delegated authority to the Colorado River Tribes in the cancellation decision. *Id.* at 309-10, 311-12. The lessee had mailed an uncertified estimate of the gross receipts with payment of three percent of that estimate, and an invoice for a public liability insurance policy to attempt to cure. The district court concluded that

the attempted cure failed to remedy the default identified in the Notice of Default letter. The lessee had a range of outstanding lease violations, including several years' worth of delinquent base rent payments, as well as his failure to pay the percentage rent since March 1991, failure to submit certified statements of gross business receipts for fiscal years 1992 to 2008, and failure to provide proper proof of current public liability insurance and fire insurance. *Id.* at 304. The lessee's attempt to cure proved insufficient given that his mailings and payments in response to the 2009 Notice of Default letter failed to address the full extent of his lease violations.

Eagle Bear's lease agreement with the Blackfeet Nation follows a pattern similar to that of the lease between the non-Indian lessee and the Colorado River Tribes in *Tuttle*. Both the *Tuttle* commercial lease and Eagle Bear's Campground lease explicitly referred to, and incorporated, Title 25 regulations governing the BIA's role in managing and terminating leases between Indian tribes and non-Indian lessees. *See Tuttle*, 168 F. Supp. 3d at 302; *see* (Doc. 29-1.) Both leases also called for lessees to make payments in advance and without "prior notice or demand." This requirement relieved the BIA from having to send invoices to prompt the lessees' timely payments. *See Tuttle*, 168 F. Supp. 3d at 302; *see* (Doc. 29-1.) In other words, submitting a late payment constituted a lease violation.

Eagle Bear's argument that its singular late payment to cure the default identified in the BIA's June 10, 2008 letter saved the lease from cancellation

parallels that of the lessee's failed argument in *Tuttle*. The lease required Eagle Bear to pay the Blackfeet Nation, through the BIA, a minimum annual payment of rent and royalties on November 30 of each year "without prior notice or demand." (Doc. 29-1 at 4-6.) The lease additionally required Eagle Bear to pay interest on delinquent payments from the due date until paid. (*Id*. at 6.) The record before the Court clearly shows Eagle Bear's repeated failure to make timely payments to the BIA. Notice letters from the BIA to Eagle Bear and the BIA's ledger of Eagle Bear's payments from 1997 through 2014 reveal multiple and continued late payments by Eagle Bear.

As the record demonstrates and as discussed above, Eagle Bear's 1998 rent payment was 269 days delinquent, *see* (Doc. 29-17 at 1); the 1999 rent payment was 272 days delinquent, *see* (Doc. 33-1); the 2000 rent payment was 259 days delinquent, *see* (Doc. 33-2); the 2001 rent payment was 229 days delinquent, *see* (Doc. 29-17 at 2); the 2002 rent payment was 907 days delinquent, *see* (*id*. at 2); the 2003 rent payment was 207 days delinquent, *see* (Doc. 33-3); the 2004 rent payment was 260 days delinquent, *see* (Doc. 29-17 at 2); and the 2005 rent payment was 202 days delinquent, *see* (*id*. at 3). Eagle Bear consistently failed to pay the gross registration receipt royalties, and it failed to file required audit reports of gross receipts in 1997, 1998, and 1999. *See* (Doc. 29-1 at 4); (Doc. 33-1.) Eagle Bear also consistently failed to pay the requisite interest penalty on its late payments. *See, e.g.*, (Doc. 33-4 at 1.)

Eagle Bear asserts that it was entitled to cure its default within 30 days under the terms of the lease, or within 10 days under the terms of the BIA's regulations, after it first received notice of its alleged default from the BIA's June 10, 2008 cancellation letter. (Doc. 23 at 33.) Eagle Bear paid $15,000 on June 16, 2008. Eagle Bear contends that this payment fell "well-within even the 10-day period allowed under the regulations." (*Id*.) Therefore, according to Eagle Bear, "the only correct decision the Regional Director could have made on appeal was to reverse the cancellation." (*Id*.) Eagle Bear's argument that the BIA failed to allow it an opportunity to cure a violation in 2008 ignores evidence in the record demonstrating its failure to timely cure lease violations on more than a dozen prior occasions which remained outstanding in June 2008.

The district court flatly rejected the lessee's similar argument in *Tuttle*. The plaintiff in *Tuttle* asserted that the BIA had violated the terms of the lease and the incorporated statutory regulations by failing to allow him an opportunity to cure. 168 F. Supp. 3d at 309. The plaintiff argued that his five-month delay in attempting to cure should be excused because of his health problems and because he had tried to cure past lease violations by providing an uncertified estimate of gross receipts. Yet the district court determined that the record showed that the lessee had failed to pay base rent timely and percentage rent for many years, and also had failed to submit adequate proof of insurance and properly audited business income statements as

required by the lease. *Id*. at 310, 312. The district court noted that the "BIA twice extended the opportunity to provide reasons not to terminate the Lease but Mr. Tuttle's submissions were vague efforts at partial cures." *Id*. at 312. The district court squarely concluded that the BIA had cancelled the lease according to the applicable statutory regulations incorporated into the lease and that the lease "did not require BIA or the Tribes to accept a long-overdue cure or to find that Mr. Tuttle's submissions constituted a satisfactory cure." *Id*.

Eagle Bear could not avoid its lease violations by merely submitting one $15,000 payment to cure the default identified in the June 10, 2008 letter. Eagle Bear's argument ignores a repetitious history of delinquency in submitting timely rental payments, interest payments, gross registration receipt royalties payments, and audit reports of gross receipts. The district court in *Tuttle* noted that the applicable regulations are not just for the benefit of tribes; these regulations "specifically provide protections for lessees." *Id*. at 309. Lessees are provided protections such as the right to receive notice, the right to cure a violation, and the right to appeal. *See* 25 C.F.R. §§ 162.618, 162.619 (2008). The BIA could not cure Eagle Bear's repetitive breaches without a waiver from the Blackfeet Nation according to the terms of the lease between Eagle Bear and the Blackfeet Nation and the regulations incorporated therein. (Doc. 29-1); *see* 25 C.F.R. § 162.619(a)(1)-(4); *see also Tuttle*, 168 F. Supp. at 312.

61

The BIA Blackfeet Agency shirked its responsibility for years following Eagle Bear's first lease violation in 1998 and successive violations. The BIA Blackfeet Agency continuously mailed show cause letters to Eagle Bear to notify the entity of its lease violations. (Doc. 33-1); (Doc. 33-2); (Doc. 33-3); (Doc. 33-4.) The BIA Blackfeet Agency allowed for numerous lease violations to pile up unaccounted for throughout the years. Similarly, the BIA Colorado River Indian Tribes Agency failed to act early to address all the lessee's violations "which were well known and had been ongoing in one iteration or another for years." *Tuttle,* 168 F.Supp.3d at 312.

The BIA failed to promptly take appropriate steps pursuant to 25 C.F.R. 162.618 regarding Eagle Bear's lease violations beginning in 1997. The BIA finally stepped into its role in 2008 to issue the show cause letter, Notice of Default, and Notice of Cancellation letter to Eagle Bear. *See* (Doc.  33-12); *see also* (Doc. 33-20); (Doc. 33-25); (Doc. 34); 25 C.F.R. §§ 162.619(a)(1)-(4) (2008). These actions constitute at best a bare minimum of compliance with regulatory requirements. It remained Eagle Bear's responsibility as the lessee to act on the right to cure fully a lease violation within the appropriate time. *Id*. The regulatory protections extended to the lessee only go so far. These protections cannot be stretched beyond their limits to allow for a lessee to violate the lease terms without consequence. "[V]ague efforts at partial cures" prove insufficient, as demonstrated in *Tuttle*. *See* 168 F. Supp. 3d at

312. Eagle Bear's Campground lease did not require the BIA or the Blackfeet Nation to accept a long-overdue cure or to find that Eagle Bear's June 2008 single payment constituted a satisfactory cure. *See id.*

> **viii.    Parties' roles and responsibilities in leasing Indian trust land.**

If the Campground lease had represented a standard contractual transaction, then Eagle Bear likely would be entitled to unjust enrichment. Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011). Unjust enrichment provides an equitable claim for restitution to prevent or remedy inequitable gain by another. *Associated Mgmt. Servs., Inc. v. Ruff*, 424 P.3d 571, 594 (2018) (citing *N. Cheyenne Tribe v. Roman Catholic Church ex rel. Great Falls/Billings Dioceses*, 296 P.3d 450 (Mont. 2013)); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 (2011). "Forms of restitution available upon proof of an unjust enrichment claim include direct restoration of the benefit conferred or gained, or imposition of a constructive trust to the same effect." *Associated Mgmt. Servs., Inc.*, 424 P.3d 571 at 594 (citing *Volk v. Goeser*, 367 P.3d 378 (2016) (noting a court's broad discretion "to impose" or "declare" a constructive trust upon proof of elements of unjust enrichment)).

Again, the lease between the Blackfeet Nation and Eagle Bear is not a standard contractual transaction. The lease expressly refers to and incorporates Title 25, Part 162 of the Code of Federal Regulations, the regulations governing "Leases and

Permits" of Indian trust land. Unjust enrichment proves inapplicable here, at least as a matter of equity within the remit of this Court. This Court lacks authority to impose a restitution obligation on the Blackfeet Nation or the BIA to make Eagle Bear whole for the improvements that it constructed. It remains the province of the Blackfeet Tribal Court to decide any resulting monetary damages. The Court expects that the Blackfeet Tribal Court would consider those potential damages in resolving the Blackfeet Nation's claim against Eagle Bear in Tribal Court. Moreover, the Bankruptcy Court can consider these matters as part of its adjudication of the proof of claims submitted by the Blackfeet Nation.

The Court observes that Eagle Bear never raised the equitable doctrine of laches in this matter. *See* (Doc. 2); *see also* (Doc. 4); *Eagle Bear v. Blackfeet Indian Nation*, 4:21-cv-88-BMM, (Doc. 1.) "When an action for restitution asserts a claim or seeks a remedy originating in equity (including restitution via rights in identifiable property [. . .]), the relief to which the claimant would otherwise be entitled may be barred if [. . .] the claimant has unreasonably delayed bringing or prosecuting the action, after the claimant had notice of the facts, and [. . .] the remedy in question would be unfairly prejudicial to another party because of an intervening change of circumstances." Restatement (Third) of Restitution and Unjust Enrichment § 70 (2011).

The United States Bankruptcy Court for the District of Montana in a parallel proceeding to the controversy before this Court made the following observation:

> Eagle Bear's desire to truncate the Blackfeet Nation's claim using laches is barred by the *nullum tempus occurrit regi* doctrine, pursuant to which no time runs against a sovereign unless that sovereign has submitted itself to a limitations period. As a governmental unit with retained sovereignty and the power to make its own laws to govern its own affairs, the *nullum tempus* doctrine permits the Blackfeet Nation to sidestep a laches defense against enforcement of those laws.

*In re: Eagle Bear Inc., Debtor.*, No. 4:22-BK-40035-WLH, 2023 WL 7198873, at *12 (Bankr. D. Mont. Oct. 24, 2023). This controversy centers on business transactions between a private entity and a sovereign. Those transactions occurred under the strictures of federal law and by the administration of a separate sovereign. "Although recognizing that legal doctrines such as laches may be deployed to protect individuals who have labored under a mistaken understanding of the law, *McGirt* squarely rejected any notion that reliance interests could undermine the enforcement a federal statute." *Oklahoma v. United States Dep't of the Interior*, 577 F. Supp. 3d 1266, 1276 (W.D. Okla. 2021) (citing to *McGirt*, 140 S. Ct. 2452 at 2478). The Blackfeet Indian Nation and the Bureau of Indian Affairs alike dodge the force of an equitable resolution at least in part by dint of their governmental statuses.

The Court's resolution of the lease cancellation dispute cannot restore Eagle Bear's nearly a decade of investment, and it cannot compensate the Blackfeet Nation for the erroneous deprivation of nearly a decade's control over its own land. The

Court can offer its assessment, however, of the gross failings of the Parties to this case. The Blackfeet Nation unmistakably stands as no idle spectator in this case. Regulations may limit the Blackfeet Nation's role in leasing Indian trust lands, but the Blackfeet Nation remains the final arbiter. The BIA must defer to a tribe's determination that a lease is in its best interest "to the maximum extent possible." *See* 25 C.F.R. § 162.107 (2008).

The protracted litigation entangling Eagle Bear's finances and the Blackfeet Nation's economic development could have been avoided had the BIA properly consulted with the Blackfeet Nation from Eagle Bear's very first violation in 1997 and mandated compliance or enforced termination of the lease. The BIA possessed no authority to require the Blackfeet Nation to accept Eagle Bear's serially late payments or attempted cures. *See, e.g.*, *Tuttle,* 168 F. Supp. 3d at 312. The Blackfeet Nation may have received revenue as BIA collected the rent, interest, and royalties on the Blackfeet Nation's behalf, but the BIA effectively forced the Blackfeet Nation to accept Eagle Bear's violations for close to a decade.

The BIA fills a central role in tribal economic development opportunities, purportedly to protect the interests of the tribes against actors—whether out of ignorance or malice—who otherwise would take advantage of tribal resources. The BIA owes no responsibility to non-Indians doing business in Indian Country except as delineated by law or contract. All persons dealing with the federal government,

by contrast, "are presumed to have knowledge of duly promulgated regulations." *Flynn v. Acting Rocky Mountain Regional Director*, 42 IBIA 206, 212 (2006) (citing *Billco Energy v. Acting Albuquerque Area Director*, 35 IBIA 1, 7 (2000)); *Blackmore v. Billings Area Director*, 30 IBIA 235, 239 (1997); *DuBray v. Acting Aberdeen Area Director*, 30 IBIA 64, 68 (1996).

Individuals or corporations seeking to purchase or lease Indian trust property are "responsible for complying with the applicable regulations and [are] not relieved of that responsibility by representations made by the [BIA]." *Flynn*, 42 IBIA at 212-13; *see also Blackmore*, 30 IBIA at 239. Eagle Bear entered a lease with the Blackfeet Nation that explicitly identified the applicable regulations. (Doc. 29-1.) Eagle Bear had the duty to understand and abide by all lease terms, including Part 162.

Brooke, as Eagle Bear's representative, failed to review the regulations ultimately incorporated into his lease when he negotiated the lease agreement. (Doc. 29-7 at 4) ("I didn't look at the CFR to see what that was even about.") Brooke instead based his agreement upon that of another "KOA who had negotiated a similar lease with the Cherokee Indian Reservation in the Great Smokies." (*Id*.) Brooke entered the lease assuming "if it worked with that tribe and with the KOA, then it would work here." (*Id*.)

Eagle Bear, as a business, compounded Brooke's early failures by relying ultimately upon BIA staff's oral advice rather than reading the terms of its lease and the relevant regulations. Eagle Bear rested its entire future, in which Brooke and his family had invested time, energy, and millions of dollars, on a conversation with a Blackfeet Agency BIA Realty Specialist who testified that she does not recall it, (Doc. 29-30 at 13), and which was only elliptically memorialized in staff-level correspondence that lacked either formality or apparent effect, (Doc. 91-1); (Doc. 91-2); (Doc. 91-3); (Doc. 91-4). Eagle Bear, through Brooke, took no steps to memorialize this staff-level conversation in writing with a properly authorized official before withdrawing the Notice of Appeal. Advice informally relayed by BIA staff cannot relieve Eagle Bear of its responsibility to comply with the applicable regulations. *Flynn*, 42 IBIA at 212-13. Eagle Bear has disregarded the unique sovereign status of the Blackfeet Nation as well as the rigid regulatory framework governing economic development opportunities in Indian Country. The Court will not force the Blackfeet Nation to bear the burden of Eagle Bear's failures.

The Court will likewise not force the Blackfeet Nation to bear the burden of Independence Bank's neglect in failing to protect its $500,000 loan to Eagle Bear. Independence Bank failed to take any action other than to contact Brooke and note the conversation by hand at the bottom of its copy of the BIA's lease cancellation letter. (Doc. 33-8); (Doc. 46-5); (Doc. 75-1.) Brooke's oral assurances apparently

satisfied Independence Bank, despite its having received the BIA cancellation letter that risked the bank's mortgage interest. The record reflects no independent review by Independence Bank of the lease document or its expressly incorporated regulations governing Indian trust land commercial leases. The record indicates that Independent Bank instead took Brooke's oral assurances at face value.

The Blackfeet Nation itself sent a series of mixed signals. The Blackfeet Tribal Business Council passed a resolution to approve the lease in 1997. (Doc. 35-15.) The Blackfeet Tribal Business Council approved a resolution to support Eagle Bear's investments in the Campground in 2007 despite nearly ten years of late payments. (Doc. 33-6.) The Blackfeet Nation received notice of Eagle Bear's appeal of the BIA's lease cancellation in 2008. (Doc. 29-13 at 5); (Doc. 29-2 at 10.) And the Blackfeet Nation knew of Eagle Bear's ongoing operation of the Campground during the period after the lease cancellation between 2008 and 2017. (Doc. 29-3 at 8); (Doc. 29-2 at 11-12.) It was aware of Eagle Bear's construction of new amenities—indeed, the Blackfeet Nation continued to inspect Eagle Bear's work on the property. (Doc. 29-3 at 8.) Nevertheless, the Court will not force the Blackfeet Nation to bear the burdens of Eagle Bear's and Independence Bank's failures because the Blackfeet Nation stands in a position where it is both protected and hamstrung by the BIA.

Neither Eagle Bear nor the Blackfeet Nation will be pleased entirely by the outcome of this case. Eagle Bear has operated as if the lease had never been cancelled and made substantial investments in the Campground. The Blackfeet Nation has lost years of the free use of its own land. The Court takes note of one common and resounding feature of this case—the incompetence of the BIA as administrator to this lease. The BIA allowed incredible leeway to Eagle Bear despite repeated late payments on the lease of Indian land. The result was over two decades of plain failure to comply with the terms to which the leaseholder had agreed with the Blackfeet Nation. And the administrative review process for resolving these claims has remained stalled since August 10, 2021, when the IBIA remanded to the BIA Rocky Mountain Regional Director the issue of the 2008 lease cancellation where it has languished since that time with no resolution.

The BIA owed the Blackfeet Nation a duty to uphold the terms of the lease from the date the lease was signed. This remarkable predicament could have been avoided if the BIA had mandated compliance or enforced termination of the lease from the onset. The BIA failed to evict the leaseholder when the BIA finally took action in 2008 to address Eagle Bear's delinquencies. The BIA allowed a cancelled lease to operate as if revived for over a decade, to the detriment of all parties involved.

70

BIA's want of enforcement may come as no shock to tribal nations, but given the undisputed existence of a trust responsibility between the United States and Indian peoples, the United State must not permit United States citizens to fail constantly to comply with their agreements with tribal nations. The Court notes but does not evaluate the wisdom of changes to federal regulations governing the leasing of Indian trust lands. *See Marbury v. Madison*, 5 U.S. 137, 137, 2 L. Ed. 60 (1803). The Court also notes that the personnel and policies of the federal administrative state change over time. The federal trust responsibility remains a fundamental and constant duty of the federal government. A state, municipality, or private party retains a business edge over a tribe when the BIA fails its mandate. Today, when lack of investment can spell a dearth of jobs and sap economic life for a Native nation, byzantine regulations enforced by federal officials who play it by ear threaten to starve tribes of opportunity and the economic fruits of their own land.

## ORDER

Accordingly, **IT IS ORDERED** that:

- The Blackfeet Nation's Motion for Summary Judgment (Doc. 27) is **GRANTED**.

- Eagle Bear's Motion for Summary Judgment (Doc. 22) is **DENIED AS MOOT**.

- The BIA's Motion for Summary Judgment (Doc. 24) is **DENIED AS MOOT**.

71

- Independence Bank's Motion for Summary Judgment (Doc. 43) is **DENIED AS MOOT**.

- Eagle Bear's Claim 1 from the adversary proceeding, *Eagle Bear, Inc. v. Blackfeet Indian Nation* (AP 22-04001) is **DISMISSED**.

- The Blackfeet Nation's Motion to Dismiss (Doc. 58) is **DENIED AS MOOT**.

- The Blackfeet Nation's Motion for Partial Summary Judgment on Count 1 of Bank's Complaint (Doc. 64) is **DENIED AS MOOT**.

- The BIA's Motion to Dismiss for Lack of Jurisdiction (Doc. 81) is **DENIED AS MOOT**.

- Eagle Bear's claim for declaratory judgment and injunctive relief in 4:21-cv-00088-BMM *Eagle Bear Inc. et al. v. The Blackfeet Indian Nation et al.* is **DISMISSED WITH PREJUDICE** and all pending motions are **DENIED AS MOOT** and the Court directs the Clerk of Court to close the case.

Dated this 8th day of December, 2023.

_____
Brian Morris, Chief District Judge
United States District Court